## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| *IN RE STRYKER CORPORATION CYBERATTACH LITIGATION* | Case No. 1:26-cv-00832<br><br><br>**DEMAND FOR JURY TRIAL** |

### CONSOLIDATED CLASS ACTION COMPLAINT AND JURY DEMAND

Plaintiffs Tom Mesmer, Dax Dodge, Joseph Frederickson, Scott Mangold, Maurice Primer, Tristan Tanner, Belva Thompson, and Stacy Trepanier ("Plaintiffs"), through their attorneys, individually and on behalf of all others similarly situated, bring this Class Action Complaint (the "Action") against Stryker Corporation ("Stryker" or "Defendant"), and its present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, and/or other related entities. Plaintiffs allege the following on information and belief—except as to their own actions, counsel's investigations, and facts of public record.

### NATURE OF ACTION

1. This class action arises from Defendant's failure to protect highly sensitive data.

2. Defendant is "a global leader in medical technologies" and offers "innovative products and services in MedSurg, Neurotechnology and Orthopaedics."[1]

3. As such, Defendant stores a litany of highly sensitive personal identifiable information ("PII") about its current and former employees. But Defendant lost control over that data when cybercriminals infiltrated its insufficiently protected computer systems in a data breach (the "Data Breach").

---

[1] *Our Company*, STRYKER, https://www.stryker.com/us/en/about.html (last visited May 8, 2026).

4.      It is unknown for precisely how long the cybercriminals had access to Defendant's network before the breach was discovered. In other words, Defendant had no effective means to prevent, detect, stop, or mitigate breaches of its systems—thereby allowing cybercriminals unrestricted access to its current and former employees' PII.

5.      On information and belief, cybercriminals were able to breach Defendant's systems because Defendant failed to adequately train its employees on cybersecurity and failed to maintain reasonable security safeguards or protocols to protect the Class's PII. In short, Defendant's failures placed the Class's PII in a vulnerable position—rendering them easy targets for cybercriminals.

6.      Plaintiffs are Data Breach victims. They bring this class action on behalf of themselves and all others harmed by Defendant's misconduct.

7.      The exposure of one's PII to cybercriminals is a bell that cannot be unrung. Before this data breach, Defendant's current and former employees' private information was exactly that—private. Not anymore. Now, their private information is forever exposed and unsecure.

**PARTIES**

8.      Plaintiff Tom Mesmer is a natural person and citizen of Tennessee and was, at other times relevant to this Action, a resident of the state of Florida.

9.      Plaintiff Dax Dodge is a natural person and a citizen of Michigan, where he intends to remain.

10.      Plaintiff Joseph Frederickson is a natural person and a citizen of Colorado, where he intends to remain.

11.      Plaintiff Scott Mangold is a natural person and a citizen of New Jersey, where he intends to remain.

2

12.    Plaintiff Maurice Primer is a natural person and a citizen of Michigan, where he intends to remain.

13.    Plaintiff Tristan Tanner is a natural person and a citizen of Connecticut, where he intends to remain.

14.    Plaintiff Belva Thompson is a natural person and a citizen of Arizona, where she intends to remain.

15.    Plaintiff Stacy Trepanier is a natural person and a citizen of Minnesota, where she intends to remain.

16.    Defendant Stryker Corporation is a for-profit corporation, incorporated in Michigan and with its principal place of business at 1941 Stryker Way, Portage, Michigan 49002. Its registered agent, C T Corporations System, can be found at 40600 Ann Arbor Rd E Ste 201, Plymouth, Michigan 48170.

**JURISDICTION AND VENUE**

17.    This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Members of the proposed Class are citizens of different states from the Defendant. And there are over 100 putative Class Members.

18.    This Court has personal jurisdiction over Defendant because it is headquartered in Michigan, regularly conducts business, and has sufficient minimum contacts in Michigan.

19.    Venue is proper in this Court because Defendant's principal office is in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District.

## BACKGROUND

*Defendant Collected and Stored the PII of Plaintiffs and the Class*

20.    Stryker is "a global leader in medical technologies" that offers "innovative products and services in MedSurg, Neurotechnology and Orthopaedics"[2] and made a $22.6 billion in global sales in 2024.[3]

21.    Stryker "impacts more than 150 million patients annually in 61 countries across the world,"[4] and has offices and manufacturing facilities in Michigan, California, Texas, Arizona, Florida, and New Jersey.[5]

22.    As part of its business, Defendant receives and maintains the PII of thousands of its current and former employees.

23.    In collecting and maintaining the PII, Defendant agreed it would safeguard the data in accordance with its internal policies, state law, and federal law. After all, Plaintiffs and Class Members themselves took reasonable steps to secure their PII.

24.    Under state and federal law, businesses like Defendant's have duties to protect their current and former employees' PII and to notify them about breaches.

25.    Defendant recognizes these duties, declaring in its "Privacy Policy" that:

---

[2] *Our Company*, STRYKER, https://www.stryker.com/us/en/about.html (last visited May 8, 2026).

[3] *2024 Comprehensive Report*, STRYKER, https://www.stryker.com/content/dam/stryker/about/annual-review/2024/Stryker-2024-Comprehensive-Report.pdf (last visited May 8, 2026).

[4] *Our Company*, STRYKER, https://www.stryker.com/us/en/about.html (last visited May 8, 2026).

[5] *Contact*, STRYKER, https://www.stryker.com/us/en/about/contact.html (last visited May 8, 2026).

4

    a.    "Stryker recognises that the personal information it receives is held in a position of trust."[6]

    b.    "Stryker seeks to fulfill that trust by adhering to general principles regarding the protection of personal information."[7]

    c.    "Stryker maintains physical, technical, and administrative safeguards to protect your personal information and only allows disclosures as permitted by law to assist in providing products or services."[8]

    d.    "The security and confidentiality of your personal information matters to us."[9]

    e.    "For this reason, Stryker has physical, technical and administrative controls in place to protect your personal information from unauthorised access, use and disclosure."[10]

    f.    "Stryker evaluates these safeguards on an ongoing basis to help minimise risks from new security threats as they become known."[11]

***Defendant's Data Breach***

26.    On or around March 11, 2026, Defendant was hacked in the Data Breach.[12]

---

[6] *Privacy Statement*, STRYKER, https://www.stryker.com/us/en/legal/privacy.html (last visited May 8, 2026).

[7] *Id.*

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] *Stryker Corporation Form 8-K*, UNITED STATES SECURITIES AND EXCHANGE COMMISSION, https://www.sec.gov/Archives/edgar/data/310764/000119312526102460/d76279d8k.htm (last visited May 8, 2026).

5

27.    Worryingly, Defendant already admitted that the Data Breach affected "certain information technology systems…that has resulted in a global disruption to [Stryker's] Microsoft environment."[13] The Data Breach  "has caused, and is expected to continue to cause, disruptions and limitations of access to certain of [Stryker's] information systems and business applications supporting aspects of [Stryker's] operations and corporate functions."[14]

28.    Because of Defendant's Data Breach, at least the following types of PII were compromised:

      a.      Name;

      b.      Social Security number;

      c.      Financial account information;

      d.      Health Insurance Information; and

      e.      Driver's license information.

29.    Due to Stryker's "Bring Your Own Device" model for employees, employees' personal phones and laptops were wiped as part of the Data Breach.  "Social media posts claiming to be Stryker employees indicated that they lost personal information such as photos, financial records, password managers, and multifactor authentication apps."[15]  Not only is this a personal intrusion of the Private Information of employees, but some of the information compromised, including password managers and multifactor authentication apps, "provides a new opening for account take over and scams tied to the still unfolding cyber incident."[16]

---

[13] *Id.*

[14] *Id.*

[15] Alla Valente, *From Operating Rooms To iPhones: What The Stryker Attack Reveals About Third-Party Risk*, FORRESTER (Mar. 16, 2026) https://www.forrester.com/blogs/from-operating-rooms-to-iphones-what-the-stryker-attack-reveals-about-third-party-risk/.

[16] *Id.*

30.     Currently, the precise number of persons injured is unclear. But upon information and belief, the size of the putative Class can be ascertained from information in Defendant's custody and control. And upon information and belief, the putative Class has over one hundred members—as it includes Defendant's current and former employees.

31.     And yet, Defendant has failed to begin notifying the Class.

32.     Thus, Defendant kept the Class in the dark—thereby depriving the Class of the opportunity to try and mitigate their injuries in a timely manner.

33.     Defendant failed its duties when its inadequate security practices caused the Data Breach. In other words, Defendant's negligence is evidenced by its failure to prevent the Data Breach and stop cybercriminals from accessing the PII. And thus, Defendant caused widespread injury and monetary damages.

34.     Since the Data Breach, Defendant claims that it "activated its cybersecurity response plan and launched an investigation internally with the support of external advisors and cybersecurity experts to assess and to contain the threat."[17]

35.     But such simple declarations are insufficient to ensure that Plaintiffs' and Class Members' PII will be protected from additional exposure in a subsequent data breach.

36.     Because of Defendant's Data Breach, the sensitive PII of Plaintiffs and Class Members was placed into the hands of cybercriminals—inflicting numerous injuries and significant damages upon Plaintiffs and Class Members.

37.     Stunningly, this Data Breach is only part and parcel of Defendant's *pattern* of negligent data security. After all, between May 14, 2024, and June 10, 2024, an unauthorized third

---

[17] *Supra* note 12.

party gained access to Stryker's internal systems and exfiltrated data from its Systems.[18] A copy

of a Breach Notice from the 2024 data breach is attached as Exhibit A.

***Handala & the Dark Web***

38.     Worryingly, the cybercriminals that obtained Plaintiffs' and Class Members' PII

appear to be the notorious cybercriminal group "Handala" or "Handala Hack Team."[19] Screenshots

of Handala's post taking responsibility for the hack are included below:



---

[18] *See* Exhibit A.

[19] Mike Clair, *Stryker Cyberattack Update: Iran-Linked Handala Group Claims Destructive Wiper Attack on Medical Tech Giant*, INTERNATIONAL BUSINESS TIMES (Mar. 12, 2026) https://www.ibtimes.com/stryker-cyberattack-update-iran-linked-handala-group-claims-destructive-wiper-attack-medical-tech-3799024





39.    Handala is an especially notorious cybercriminal group. In fact, Handala "first

surfaced in December 2023 as a hacktivist operation linked to Iran's Ministry of Intelligence and

9

Security (MOIS), initially targeting Israeli organizations with destructive malware."[20] Specifically, "[m]ultiple threat intelligence firms assess Handala as one of several…actor[s] optimized for psychological and reputational disruption — breaking into systems, conducting hack-and-leak activity, and timing the publication of stolen material to maximize pressure."[21]

40. Upon information and belief, the cybercriminals in question are particularly sophisticated. After all, the cybercriminals: (1) defeated the relevant data security systems, (2) gained actual access to sensitive data, and (3) successfully accessed and acquired data.

41. And as the Harvard Business Review notes, such "[c]ybercriminals frequently use the Dark Web—a hub of criminal and illicit activity—to sell data from companies that they have gained unauthorized access to through credential stuffing attacks, phishing attacks, [or] hacking."[22]

42. Worryingly, Handala claimed to wipe "data from over 200,000 servers, mobile devices and other systems across Stryker's operations"[23] and extract "50 terabytes of critical data and forcing office closures worldwide."[24]

43. Following Handala's attack on Stryker, Handala proceeded to leak the stolen data. While the two original domains used by Handala to leak the data were seized by the Federal Bureau

---

[20] *Id.*

[21] Mihir Bagwe, *Who Is Handala — The Iran-Linked Ghost Group That Just Wiped 200K Stryker Devices*, THE CYBER EXPRESS, (Mar. 13, 2026) https://thecyberexpress.com/who-is-handala-hackers-in-stryker-cyberattack/.

[22] Brenda R. Sharton, *Your Company's Data Is for Sale on the Dark Web. Should You Buy It Back?*, HARVARD BUS. REV. (Jan. 4, 2023) https://hbr.org/2023/01/your-companys-data-is-for-sale-on-the-dark-web-should-you-buy-it-back.

[23] Mike Clair, *Stryker Cyberattack Update: Iran-Linked Handala Group Claims Destructive Wiper Attack on Medical Tech Giant*, INTERNATIONAL BUSINESS TIMES (Mar. 12, 2026) https://www.ibtimes.com/stryker-cyberattack-update-iran-linked-handala-group-claims-destructive-wiper-attack-medical-tech-3799024.

[24] *Id.*

of Investigation ("FBI"), Handala quickly rebuilt new versions of the seized infrastructure within one day.[25]

44.    On March 23, 2026, Stryker admitted that malware was used by the cybercriminals, despite repeatedly telling the public and regulators that no ransomware or malware was involved.[26]

45.    Still, despite this public evidence of broad misuse, Defendant misleadingly claims that "[Stryker] has no indication of ransomware or malware and believes the incident is contained."[27]

46.    Thus, on information and belief, Plaintiffs' and the Class's stolen PII has already been published—or will be published imminently—by cybercriminals on the dark web.

---

[25] Steve Alder, *Stryker Cyberattack Has Impacted First Quarter Earnings*, THE HIPAA JOURNAL (Apr. 15, 2026) https://www.hipaajournal.com/stryker-cyberattack-iran/; Ari Ben Am, *6 Things To Know About Handala-Tehran's Hackers Making Front Page News*, FOUNDATION FOR DEFENSE OF DEMOCRACIES  https://www.fdd.org/analysis/2026/04/01/6-things-to-know-about-handala-tehrans-hackers-making-front-page-news/ (last accessed Apr. 30, 2026); A.J. Vicens, *Iran-linked hackers restore website after US seizes domains*, REUTERS (Mar. 20, 2026) https://www.reuters.com/technology/iran-linked-hackers-restore-website-after-us-seizes-domains-2026-03-20/ (following the FBI's seizure of the two domains, Ari Ban Am, of the Foundation for Defense of Democracies Center on Cyber and Technology Innovation noted that "Iranian threat actors, MOIS in particular, are no strangers to takedowns . . . Handala alone has had tens of Telegram channels, X accounts and domains taken down, and these takedowns have never slowed them down significantly. It will be trivial for Handala and its MOIS operators to get that content back up on another domain very, very soon.").

[26]    *Customer Updates; Stryker Network Disruption*, STRYKER, https://www.stryker.com/us/en/about/news/2026/a-message-to-our-customers-03-2026.html (last visited May 8, 2026); *Stryker Corporation Form 8-K*, UNITED STATES SECURITIES AND EXCHANGE COMMISSION, https://www.sec.gov/Archives/edgar/data/310764/000119312526102460/d76279d8k.htm    (last visited May 8, 2026).

[27] *Stryker Corporation Form 8-K*, UNITED STATES SECURITIES AND EXCHANGE COMMISSION, https://www.sec.gov/Archives/edgar/data/310764/000119312526102460/d76279d8k.htm    (last visited May 8, 2026).

*Plaintiff Tom Mesmer's Experiences and Injuries*

47.    Plaintiff Tom Mesmer is a former employee of Defendant; he worked for Defendant as a customer service representative in Tampa from November 2017 to October 2023.

48.    Thus, Defendant obtained and maintained Plaintiff's PII.

49.    As a result, Plaintiff was injured by Defendant's Data Breach.

50.    Plaintiff is very careful about the privacy and security of his PII. He does not knowingly transmit his PII over the internet in an unsafe manner. He is careful to store any documents containing his PII in a secure location.

51.    As a condition of his employment with Defendant, Plaintiff provided Defendant with his PII. Defendant used that PII to facilitate its employment of Plaintiff, including payroll, and required Plaintiff to provide that PII in order to obtain employment and payment for that employment.

52.    Plaintiff provided his PII to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.

53.    Plaintiff reasonably understood that a portion of the funds derived from his employment would be used by Defendant to pay for adequate cybersecurity and protection of PII.

54.    Plaintiff does not recall ever learning that his information was compromised in a data breach incident—other than the Data Breach at issue here.

55.    Through its Data Breach, Defendant compromised Plaintiff's PII.

12

56.     Plaintiff has *already* suffered fraud: around the time of the Data Breach, Plaintiff received a LinkedIn invitation and message from a fraudulent actor posing as a Stryker employee in an attempt to commit social-engineering fraud.

57.     Plaintiff has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft.

58.     Plaintiff fears for his personal financial security and worries about what information was exposed in the Data Breach.

59.     Because of Defendant's Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

60.     Plaintiff suffered actual injury from the exposure and theft of his PII—which violates his rights to privacy.

61.     Plaintiff suffered actual injury in the form of damages to and diminution in the value of his PII. After all, PII is a form of intangible property—property that Defendant was required to adequately protect.

62.     Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff's PII right in the hands of criminals.

63.     Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try to mitigate his injuries.

64.    Today, Plaintiff has a continuing interest in ensuring that his PII—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

***Plaintiff Dax Dodge's Experiences and Injuries***

65.    Plaintiff Dax Dodge is a current employee of Defendant.

66.    Thus, Defendant obtained and maintained Plaintiff's PII.

67.    As a result, Plaintiff was injured by Defendant's Data Breach.

68.    Plaintiff is very careful about the privacy and security of his PII. He does not knowingly transmit his PII over the internet in an unsafe manner. He is careful to store any documents containing his PII in a secure location.

69.    As a condition of his employment with Defendant, Plaintiff provided Defendant with his PII. Defendant used that PII to facilitate its employment of Plaintiff, including payroll, and required Plaintiff to provide that PII in order to obtain employment and payment for that employment.

70.    Plaintiff provided his PII to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.

71.    Plaintiff reasonably understood that a portion of the funds derived from his employment would be used by Defendant to pay for adequate cybersecurity and protection of PII.

72.    Plaintiff does not recall ever learning that his information was compromised in a data breach incident—other than the Data Breach at issue here.

14

73. On March 11, 2026, Plaintiff was sent home from work due to Defendant's computer systems being down.

74. Plaintiff was not been able to return to work due to the Data Breach until after March 16, 2026.

75. Plaintiff is an hourly employee and was not paid for at least 34 hours because Defendant was not operational after the Data Breach.

76. On information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the dark web.

77. Through its Data Breach, Defendant compromised Plaintiff's PII.

78. Plaintiff has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft.

79. And in the aftermath of the Data Breach, Plaintiff suffered from a spike in spam and scam emails, text messages, and phone calls.

80. Plaintiff fears for his personal financial security and worries about what information was exposed in the Data Breach.

81. Because of Defendant's Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

82. Plaintiff suffered actual injury from the exposure and theft of his PII—which violates his rights to privacy.

83.     Plaintiff suffered actual injury in the form of damages to and diminution in the value of his PII. After all, PII is a form of intangible property—property that Defendant was required to adequately protect.

84.     Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff's PII right in the hands of criminals.

85.     Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try to mitigate his injuries.

86.     Today, Plaintiff has a continuing interest in ensuring that his PII—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

***Plaintiff Joseph Frederickson's Experiences and Injuries***

87.     Plaintiff Joseph Fredrickson is a former employee of Defendant.

88.     Thus, Defendant obtained and maintained Plaintiff's PII.

89.     As a result, Plaintiff was injured by Defendant's Data Breach.

90.     Plaintiff is very careful about the privacy and security of his PII. He does not knowingly transmit his PII over the internet in an unsafe manner. He is careful to store any documents containing his PII in a secure location.

91.     As a condition of his employment with Defendant, Plaintiff provided Defendant with his PII. Defendant used that PII to facilitate its employment of Plaintiff, including payroll, and required Plaintiff to provide that PII in order to obtain employment and payment for that employment.

16

92.     Plaintiff provided his PII to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.

93.     Plaintiff reasonably understood that a portion of the funds derived from his employment would be used by Defendant to pay for adequate cybersecurity and protection of PII.

94.     Plaintiff does not recall ever learning that his information was compromised in a data breach incident—other than the Data Breach at issue here.

95.     On information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the dark web.

96.     Through its Data Breach, Defendant compromised Plaintiff's PII.

97.     Plaintiff has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft.

98.     Plaintiff fears for his personal financial security and worries about what information was exposed in the Data Breach.

99.     Because of Defendant's Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

100.    Plaintiff suffered actual injury from the exposure and theft of his PII—which violates his rights to privacy.

101.    Plaintiff suffered actual injury in the form of damages to and diminution in the value of his PII. After all, PII is a form of intangible property—property that Defendant was required to adequately protect.

102.    Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff's PII right in the hands of criminals.

103.    Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try and mitigate his injuries.

104.    Today, Plaintiff has a continuing interest in ensuring that his PII—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

***Plaintiff Scott Mangold's Experiences and Injuries***

105.    Plaintiff Scott Mangold is a former employee of Defendant.

106.    Thus, Defendant obtained and maintained Plaintiff's PII.

107.    As a result, Plaintiff was injured by Defendant's Data Breach.

108.    Plaintiff is very careful about the privacy and security of his PII. He does not knowingly transmit his PII over the internet in an unsafe manner. He is careful to store any documents containing his PII in a secure location.

109.    As a condition of his employment with Defendant, Plaintiff provided Defendant with his PII. Defendant used that PII to facilitate its employment of Plaintiff, including payroll, and required Plaintiff to provide that PII in order to obtain employment and payment for that employment.

110. Plaintiff provided his PII to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.

111. Plaintiff reasonably understood that a portion of the funds derived from his employment would be used by Defendant to pay for adequate cybersecurity and protection of PII.

112. On information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the dark web.

113. Through its Data Breach, Defendant compromised Plaintiff's PII.

114. Plaintiff has *already* suffered from identity theft and fraud—whereby, around the time of the Data Breach, Plaintiff received a dark web alert from LifeLock alerting him that his PII, including an email and password he used during his time he worked with Stryker, was found on the dark web.

115. Plaintiff has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft.

116. Plaintiff fears for his personal financial security and worries about what information was exposed in the Data Breach.

117. Because of Defendant's Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

118. Plaintiff suffered actual injury from the exposure and theft of his PII—which violates his rights to privacy.

19

119.    Plaintiff suffered actual injury in the form of damages to and diminution in the value of his PII. After all, PII is a form of intangible property—property that Defendant was required to adequately protect.

120.    Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff's PII right in the hands of criminals.

121.    Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try and mitigate his injuries.

122.    Today, Plaintiff has a continuing interest in ensuring that his PII—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

**Plaintiff Maurice Primer's Experiences and Injuries**

123.    Plaintiff Maurice Primer is an employee of Defendant.

124.    Thus, Defendant obtained and maintained Plaintiff's PII.

125.    As a result, Plaintiff was injured by Defendant's Data Breach.

126.    Plaintiff is very careful about the privacy and security of his PII. He does not knowingly transmit his PII over the internet in an unsafe manner. He is careful to store any documents containing his PII in a secure location.

127.    As a condition of his employment with Defendant, Plaintiff provided Defendant with his PII. Defendant used that PII to facilitate its employment of Plaintiff, including payroll, and required Plaintiff to provide that PII in order to obtain employment and payment for that employment.

20

128.    Plaintiff provided his PII to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.

129.    Plaintiff reasonably understood that a portion of the funds derived from his employment would be used by Defendant to pay for adequate cybersecurity and protection of PII.

130.    Plaintiff does not recall ever learning that his information was compromised in a data breach incident—other than the Data Breach at issue here.

131.    On information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the dark web.

132.    Through its Data Breach, Defendant compromised Plaintiff's PII.

133.    Plaintiff has *already* suffered from identity theft and fraud—whereby Plaintiff experienced fraudulent activity associated with his Apple account shortly after the Data Breach.

134.    Plaintiff has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft.

135.    Plaintiff fears for his personal financial security and worries about what information was exposed in the Data Breach.

136.    Because of Defendant's Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

137.    Plaintiff suffered actual injury from the exposure and theft of his PII—which violates his rights to privacy.

138.    Plaintiff suffered actual injury in the form of damages to and diminution in the value of his PII. After all, PII is a form of intangible property—property that Defendant was required to adequately protect.

139.    Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff's PII right in the hands of criminals.

140.    Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try to mitigate his injuries.

141.    Today, Plaintiff has a continuing interest in ensuring that his PII—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

***Plaintiff Tristan Tanner's Experiences and Injuries***

142.    Plaintiff Tristan Tanner is a former employee of Defendant; he worked for Defendant as a customer service representative in Tampa from November 2017 to October 2023.

143.    Thus, Defendant obtained and maintained Plaintiff's PII.

144.    As a result, Plaintiff was injured by Defendant's Data Breach.

145.    Plaintiff is very careful about the privacy and security of his PII. He does not knowingly transmit his PII over the internet in an unsafe manner. He is careful to store any documents containing his PII in a secure location.

146.    As a condition of his employment with Defendant, Plaintiff provided Defendant with his PII. Defendant used that PII to facilitate its employment of Plaintiff, including payroll, and required Plaintiff to provide that PII in order to obtain employment and payment for that employment.

147. Plaintiff provided his PII to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.

148. Plaintiff reasonably understood that a portion of the funds derived from his employment would be used by Defendant to pay for adequate cybersecurity and protection of PII.

149. On information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the dark web.

150. Through its Data Breach, Defendant compromised Plaintiff's PII.

151. Plaintiff has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft.

152. Plaintiff fears for his personal financial security and worries about what information was exposed in the Data Breach.

153. Because of Defendant's Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

154. Plaintiff suffered actual injury from the exposure and theft of his PII—which violates his rights to privacy.

155. Plaintiff suffered actual injury in the form of damages to and diminution in the value of his PII. After all, PII is a form of intangible property—property that Defendant was required to adequately protect.

156.    Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff's PII right in the hands of criminals.

157.    Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try to mitigate his injuries.

158.    Today, Plaintiff has a continuing interest in ensuring that his PII—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

### *Plaintiff Belva Thompson's Experiences and Injuries*

159.    Plaintiff Belva Thompson is a current employee of Defendant.

160.    Thus, Defendant obtained and maintained Plaintiff's PII.

161.    As a result, Plaintiff was injured by Defendant's Data Breach.

162.    Plaintiff is very careful about the privacy and security of her PII. She does not knowingly transmit her PII over the internet in an unsafe manner. She is careful to store any documents containing her PII in a secure location.

163.    As a condition of her employment with Defendant, Plaintiff provided Defendant with her PII. Defendant used that PII to facilitate its employment of Plaintiff, including payroll, and required Plaintiff to provide that PII in order to obtain employment and payment for that employment.

164.    Plaintiff provided her PII to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.

165. Plaintiff reasonably understood that a portion of the funds derived from her employment would be used to pay for adequate cybersecurity and protection of PII.

166. Through its Data Breach, Defendant compromised Plaintiff's PII.

167. Plaintiff has *already* suffered from identity theft and fraud—whereby right after the Data Breach, she had multiple instances of account openings/attempts.

168. Plaintiff received a denial notice for a credit application she did not submit, and an unauthorized account was opened in her name.

169. As a result, Plaintiff's credit score dropped by 46 points.

170. On or about March 17, 2026, Plaintiff began receiving multiple alerts from Credit Shield indicating her login credentials had been found on the dark web. That same day, she was locked out of her bank account twice after an unknown actor repeatedly changed her password.

171. Plaintiff has spent—and will continue to spend—significant time and effort monitoring her accounts to protect herself from identity theft.

172. And in the aftermath of the Data Breach, Plaintiff suffered from a spike in spam and scam text messages and phone calls.

173. Plaintiff fears for her personal financial security and worries about what information was exposed in the Data Breach.

174. Because of Defendant's Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

175. Plaintiff suffered actual injury from the exposure and theft of her PII—which violates her rights to privacy.

176.    Plaintiff suffered actual injury in the form of damages to and diminution in the value of her PII. After all, PII is a form of intangible property—property that Defendant was required to adequately protect.

177.    Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff's PII right in the hands of criminals.

178.    Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try and mitigate her injuries.

179.    Today, Plaintiff has a continuing interest in ensuring that her PII—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

**Plaintiff Stacy Trepanier's Experiences and Injuries**

180.    Plaintiff Stacy Trepanier is a former employee of Defendant.

181.    Thus, Defendant obtained and maintained Plaintiff's PII.

182.    As a result, Plaintiff was injured by Defendant's Data Breach.

183.    Plaintiff is very careful about the privacy and security of her PII. She does not knowingly transmit her PII over the internet in an unsafe manner. She is careful to store any documents containing her PII in a secure location.

184.    As a condition of her employment with Defendant, Plaintiff provided Defendant with her PII. Defendant used that PII to facilitate its employment of Plaintiff, including payroll, and required Plaintiff to provide that PII in order to obtain employment and payment for that employment.

26

185. Plaintiff provided her PII to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.

186. Plaintiff reasonably understood that a portion of the funds derived from her employment would be used to pay for adequate cybersecurity and protection of PII.

187. Through its Data Breach, Defendant compromised Plaintiff's PII.

188. Plaintiff has spent—and will continue to spend—significant time and effort monitoring her accounts to protect herself from identity theft.

189. And in the aftermath of the Data Breach, Plaintiff suffered from a spike in spam and scam emails and phone calls.

190. Plaintiff fears for her personal financial security and worries about what information was exposed in the Data Breach.

191. Because of Defendant's Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

192. Plaintiff suffered actual injury from the exposure and theft of her PII—which violates her rights to privacy.

193. Plaintiff suffered actual injury in the form of damages to and diminution in the value of her PII. After all, PII is a form of intangible property—property that Defendant was required to adequately protect.

194.    Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff's PII right in the hands of criminals.

195.    Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try and mitigate her injuries.

196.    Today, Plaintiff has a continuing interest in ensuring that her PII—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

***Consumers Prioritize Data Security***

197.    In 2024, the technology and communications conglomerate Cisco published the results of its multi-year "Consumer Privacy Survey."[28] Therein, Cisco reported the following:

   a.    "For the past six years, Cisco has been tracking consumer trends across the privacy landscape. During this period, privacy has evolved from relative obscurity to a customer requirement with more than 75% of consumer respondents saying they won't purchase from an organization they don't trust with their data."[29]

   b.    "Privacy has become a critical element and enabler of customer trust, with 94% of organizations saying their customers would not buy from them if they did not protect data properly."[30]

---

[28] *Privacy Awareness: Consumers Taking Charge to Protect Personal*, CISCO, https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-consumer-privacy-report-2024.pdf (last visited May 8, 2026).
[29] *Id.* at 3.
[30] *Id.*

c.    89% of consumers stated that "I care about data privacy."[31]

d.    83% of consumers declared that "I am willing to spend time and money to protect data" and that "I expect to pay more" for privacy.[32]

e.    51% of consumers revealed that "I have switched companies or providers over their data policies or data-sharing practices."[33]

f.    75% of consumers stated that "I will not purchase from organizations I don't trust with my data."[34]

### Plaintiffs and the Proposed Class Suffered Common Injuries and Damages

198.    Because of Defendant's failure to prevent the Data Breach, Plaintiffs and Class Members suffered—and will continue to suffer—damages. These damages include, *inter alia*, monetary losses, lost time, anxiety, and emotional distress. Also, they suffered or are at an increased risk of suffering:

a.    loss of the opportunity to control how their PII is used;

b.    diminution in value of their PII;

c.    compromise and continuing publication of their PII;

d.    out-of-pocket costs from trying to prevent, detect, and recover from identity theft and fraud;

e.    lost opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, *inter alia*, preventing, detecting, contesting, and recovering from identity theft and fraud;

---

[31] *Id.* at 9.
[32] *Id.*
[33] *Id.*
[34] *Id.* at 11.

f.    delay in receipt of tax refund monies;

g.    unauthorized use of their stolen PII; and

h.    continued risk to their PII—which remains in Defendant's possession—and is thus as risk for futures breaches so long as Defendant fails to take appropriate measures to protect the PII.

***Substantially Increased Risk of Identity Theft and Fraud***

199.    Plaintiffs and Class Members are at a heightened risk of identity theft for years to come because of the Data Breach.

200.    The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 17 C.F.R. § 248.201 (2013).

201.    The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." *Id*.

202.    The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal individuals' personal data to monetize the information. Criminals monetize the data by selling the stolen information on the internet black market (aka the dark web) to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

203.    The "dark web" is an unindexed layer of the internet that requires special software or authentication to access.[35] Criminals in particular favor the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or "surface" web, dark web users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the dark web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[36]  This prevents dark web marketplaces from being easily monitored by authorities or accessed by those not in the know.

204.    The unencrypted PII of Plaintiffs and Class Members has or will end up for sale on the dark web because that is the *modus operandi* of hackers. In addition, unencrypted and detailed PII may fall into the hands of companies that will use it for targeted marketing without the approval of Plaintiffs and Class Members. Unauthorized individuals can easily access Plaintiffs' and Class Members' PII.

205.    Theft of Social Security numbers also creates a particularly alarming situation for victims because those numbers cannot easily be replaced. In order to obtain a new number, a breach victim has to demonstrate ongoing harm from misuse of their SSN, and a new SSN will not be provided until after the victim has suffered the harm.

206.    In particular, the theft of Social Security numbers—in combination with other PII (e.g., name, address, date of birth)—provides cybercriminals with a "skeleton key" to commit rampant fraud and identity theft.

207.    For example, cybersecurity expert Jim Stickley explained to Time Magazine that "[i]f I have your name and your Social Security number, and you haven't gotten a credit freeze

---

[35]    Louis DeNicola, *What Is the Dark Web?*, EXPERIAN (MAY 12, 2021), https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/.
[36] *Id.*

yet, you're easy pickings . . . With that, you can do whatever you want . . . You can become that person."[37] For context, Jim Stickley is a "penetration tester" who is employed by businesses "to infiltrate their systems in order to find flaws they can fix before the bad guys exploit them."[38]

208.    There may also be a time lag between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. Fraud and identity theft resulting from the Data Breach may go undetected until debt collection calls commence months, or even years, later. An individual may not know that their Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

209.    For example, on average it takes approximately three months for consumers to discover their identity has been stolen and used, and it takes some individuals up to three years to learn that information.[39]

210.    It is within this context that Plaintiffs and all other Class Members must now live with the knowledge that their PII is forever in cyberspace and was taken by people willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black market.

211.    Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take

---

[37] Patrick L. Austin, *'It Is Absurd.' Data Breaches Show it's Time to Rethink How We Use Social Security Numbers, Experts Say*, TIME MAGAZINE (Aug. 5, 2019) https://time.com/5643643/capital-one-equifax-data-breach-social-security/.
[38] *Id.*
[39] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. SYSTEMICS, CYBERNETICS & INFORMATICS 9 (2019) http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

on the victim's identity, or to track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

212.    For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

213.    Identity thieves can also use an individual's personal data and PII to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's information, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant issued in the victim's name.[40]

214.    One example of criminals piecing together bits and pieces of compromised PII to create comprehensive dossiers on individuals is called "Fullz" packages.[41]  These dossiers are both

---

[40] *Identity Theft and Your Social Security Number,* SOCIAL SECURITY ADMINISTRATION, 1 (2018), https://www.ssa.gov/pubs/EN-05-10064.pdf. (last visited May 8, 2026).

[41] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials

shockingly accurate and comprehensive. With "Fullz" packages, cybercriminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals. For example, they can combine the stolen PII, and with unregulated data found elsewhere on the internet (like phone numbers, emails, addresses, etc.).

215.    The development of "Fullz" packages means that the PII exposed in the Data Breach can easily be linked to data of Plaintiffs and the Class that is available on the internet. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiffs and Class Members, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiffs' and other Class Members' stolen PII is being misused, and that such misuse is fairly traceable to the Data Breach.

216.    According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.[42]

---

associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.,* Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm,* KREBS ON SECURITY (Sep. 18, 2014), https://krebsonsecuritv.com/2014/09/    medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm.

[42] *2019 Internet Crime Report* (Feb. 11, 2020) FED. BUREAU INTELLIGENCE, https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120 (last visited May 8, 2026).

217.    Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good."  Yet, Defendant failed to rapidly report to Plaintiffs and the Class that their PII was stolen.  Defendant's failure to promptly and properly notify Plaintiffs and Class Members of the Data Breach exacerbated Plaintiffs' and Class Members' injuries by depriving them of the earliest ability to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

218.    Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

219.    In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their PII. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

220.    Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen PII. To protect themselves, Plaintiffs and Class Members will need to remain vigilant for years or even decades to come.

***Defendant Knew—Or Should Have Known—of the Risk of a Data Breach***

221.    Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in recent years.

222.    In 2024, a record 3,158 data breaches occurred—exposing approximately

1,350,835,988 sensitive records (i.e., 211% increase year over year).[43]

223.    Indeed, cyberattacks have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service issue warnings to potential targets, so they are aware of and prepared for a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals . . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[44]

224.    Therefore, the increase in such attacks and attendant risk of future attacks was widely known to the public and to anyone in Defendant's industry, including Defendant.

**Defendant Could Have Prevented the Data Breach**

225.    Data breaches are preventable.[45] Indeed, the American Bar Association published a treatise titled the *Data Breach and Encryption Handbook* wherein the author explained that:

a.    "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[46]

b.    "Organizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised[.]"[47]

---

[43] *2024 Data Breach Report*, IDENTITY THEFT RESOURCE CENTER (Jan. 2025), https://www.idtheftcenter.org/wp-content/uploads/2025/02/ITRC_2024DataBreachReport.pdf.
[44] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.
[45] Lucy L. Thomson, *Despite the Alarming Trends, Data Breaches Are Preventable*, DATA BREACH AND ENCRYPTION HANDBOOK (2012).
[46] *Id.* at 17.
[47] *Id.* at 28.

c.      "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures . . . . Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a data breach never occurs." [48]

***Defendant Failed to Follow FTC Guidelines***

226.    According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making. Thus, the FTC issued numerous guidelines identifying best data security practices that businesses—like Defendant—should use to protect against unlawful data exposure.

227.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*. There, the FTC set guidelines for what data security principles and practices businesses must use.[49] The FTC declared that, *inter alia*, businesses must:

a.      protect the personal customer information that they keep;

b.      properly dispose of personal information that is no longer needed;

c.      encrypt information stored on computer networks;

d.      understand their network's vulnerabilities; and

e.      implement policies to correct security problems.

228.    The guidelines also recommend that businesses watch for the transmission of large amounts of data out of the system—and then have a response plan ready for such a breach.

---

[48] *Id.*

[49] *Protecting Personal Information: A Guide for Business,* FED TRADE COMMISSION (Oct. 2016) https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

229.    Furthermore, the FTC explains that companies must:

    a.    not maintain information longer than is needed to authorize a transaction;

    b.    limit access to sensitive data;

    c.    require complex passwords to be used on networks;

    d.    use industry-tested methods for security;

    e.    monitor for suspicious activity on the network; and

    f.    verify that third-party service providers use reasonable security measures.

230.    The FTC brings enforcement actions against businesses for failing to protect customer data adequately and reasonably. Thus, the FTC treats the failure—to use reasonable and appropriate measures to protect against unauthorized access to confidential consumer data—as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

231.    In short, Defendant's failure to use reasonable and appropriate measures to protect against unauthorized access to its current and former employees' data constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

**_Defendant Failed to Follow Industry Standards_**

232.    Several best practices have been identified that—at a _minimum_—should be implemented by businesses like Defendant. These industry standards include: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption (making data unreadable without a key); multi-factor authentication; backup data; and limiting which employees can access sensitive data.

233.    Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting physical security systems; protecting against any possible communication system; and training staff regarding critical points.

234.    Upon information and belief, Defendant failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

235.    These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, Defendant opened the door to the criminals—thereby causing the Data Breach.

## CLASS ACTION ALLEGATIONS

236.    Plaintiffs bring this class action under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), individually and on behalf of all members of the following class:

> All individuals residing in the United States whose PII was compromised in the Data Breach discovered in March 2026, including all those individuals who received notice of the Data Breach.

237.    Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any

successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

238.    Plaintiffs reserve the right to amend the Class definition.

239.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on class-wide basis using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

240.    Ascertainability. All members of the proposed Class are readily ascertainable from information in Defendant's custody and control.

241.    Numerosity. The Class Members are so numerous that joinder of all Class Members is impracticable. Upon information and belief, the proposed Class includes at least 100 members.

242.    Typicality. Plaintiffs' claims are typical of Class Members' claims as each arises from the same Data Breach, the same alleged violations by Defendant, and the same unreasonable manner of notifying individuals about the Data Breach.

243.    Adequacy. Plaintiffs will fairly and adequately protect the proposed Class's common interests. Their interests do not conflict with Class Members' interests. And Plaintiffs have retained counsel—including lead counsel—that is experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf.

244.    Commonality and Predominance. Plaintiffs' and the Class's claims raise predominantly common fact and legal questions—which predominate over any questions affecting individual Class Members—for which a class-wide proceeding can answer for all Class Members. In fact, a class-wide proceeding is necessary to answer the following questions:

      a.     if Defendant had a duty to use reasonable care in safeguarding Plaintiffs' and the Class's PII;

b.    if Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c.    if Defendant was negligent in maintaining, protecting, and securing PII;

d.    if Defendant breached contract promises to safeguard Plaintiffs' and the Class's PII;

e.    if Defendant took reasonable measures to determine the extent of the Data Breach after discovering it;

f.    if Defendant's Breach Notice was reasonable;

g.    if the Data Breach caused Plaintiffs and the Class injuries;

h.    what the proper damages measure is; and

i.    if Plaintiffs and the Class are entitled to damages, treble damages, and or injunctive relief.

245.    <u>Superiority.</u> A class action will provide substantial benefits and is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class Members are relatively small compared to the burden and expense that individual litigation against Defendant would require. Thus, it would be practically impossible for Class Members, on an individual basis, to obtain effective redress for their injuries. Not only would individualized litigation increase the delay and expense to all parties and the courts, but individualized litigation would also create the danger of inconsistent or contradictory judgments arising from the same set of facts. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, ensures economies of

scale, provides comprehensive supervision by a single court, and presents no unusual management difficulties.

## FIRST CAUSE OF ACTION
### Negligence
### (On Behalf of Plaintiffs and the Class)

246.    Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

247.    Plaintiffs and the Class entrusted their PII to Defendant on the premise and with the understanding that Defendant would safeguard their PII, use their PII for business purposes only, and/or not disclose their PII to unauthorized third parties.

248.    Defendant owed a duty of care to Plaintiffs and Class Members because it was foreseeable that Defendant's failure—to use adequate data security in accordance with industry standards for data security—would compromise their PII in a data breach. And here, that foreseeable danger came to pass.

249.    Defendant has full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and the Class could and would suffer if their PII was wrongfully disclosed.

250.    Defendant owed these duties to Plaintiffs and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's inadequate security practices. After all, Defendant actively sought and obtained Plaintiffs' and Class Members' PII.

251.    Defendant owed—to Plaintiffs and Class Members—at least the following duties to:

       a.    exercise reasonable care in handling and using the PII in its care and custody;

42

     b.     implement industry-standard security procedures sufficient to reasonably protect the information from a data breach, theft, and unauthorized;

     c.     promptly detect attempts at unauthorized access; and

     d.     notify Plaintiffs and Class Members within a reasonable timeframe of any breach to the security of their PII.

252.    Thus, Defendant owed a duty to timely and accurately disclose to Plaintiffs and Class Members the scope, nature, and occurrence of the Data Breach. After all, this duty is required and necessary for Plaintiffs and Class Members to take appropriate measures to protect their PII, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

253.    Defendant also had a duty to exercise appropriate clearinghouse practices to remove PII it was no longer required to retain under applicable regulations.

254.    Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII of Plaintiffs and the Class involved an unreasonable risk of harm to Plaintiffs and the Class, even if the harm occurred through the criminal acts of a third party.

255.    Defendant's duty to use reasonable security measures arose because of the special relationship that existed between Defendant and Plaintiffs and the Class. That special relationship arose because Plaintiffs and the Class entrusted Defendant with their confidential PII, a necessary part of obtaining employment from Defendant.

256.    The risk that unauthorized persons would attempt to gain access to the PII and misuse it was foreseeable. Given that Defendant hold vast amounts of PII, it was inevitable that

unauthorized individuals would attempt to access Defendant's databases containing the PII — whether by malware or otherwise.

257. PII is highly valuable, and Defendant knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII of Plaintiffs and Class Members and the importance of exercising reasonable care in handling it.

258. Defendant improperly and inadequately safeguarded the PII of Plaintiffs and the Class in deviation from standard industry rules, regulations, and practices at the time of the Data Breach.

259. Defendant breached these duties as evidenced by the Data Breach.

260. Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiffs' and Class Members' PII by:

      a. disclosing and providing access to this information to third parties and

      b. failing to properly supervise both the way the PII was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

261. Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the personal information and PII of Plaintiffs and Class Members, which actually and proximately caused the Data Breach and Plaintiffs' and Class Members' injury.

262. Defendant further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiffs and Class Members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiffs' and Class Members' injuries-in-fact.

263.    Defendant has admitted that the PII of Plaintiffs and the Class was wrongfully lost and disclosed to unauthorized third persons because of the Data Breach.

264.    As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiffs and Class Members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

265.    And, on information and belief, Plaintiffs' PII has already been published—or will be published imminently—by cybercriminals on the dark web.

266.    Defendant's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiffs and Class Members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their PII by criminals, improper disclosure of their PII, lost benefit of their bargain, lost value of their PII, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendant's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

### SECOND CAUSE OF ACTION
**Negligence *per se***
**(On Behalf of Plaintiffs and the Class)**

267.    Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

268.    Under the FTC Act, 15 U.S.C. § 45, Defendant had a duty to use fair and adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' PII.

269.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect the PII entrusted to it. The FTC

45

publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendant's duty to protect Plaintiffs' and the Class Members' sensitive PII.

270. Defendant breached its respective duties to Plaintiffs and Class Members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard PII.

271. Defendant violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII Defendant had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

272. The harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and members of the Class.

273. But for Defendant's wrongful and negligent breach of its duties owed, Plaintiffs and Class Members would not have been injured.

274. The injury and harm suffered by Plaintiffs and Class Members was the reasonably foreseeable result of Defendant's breach of their duties. Defendant knew or should have known that Defendant was failing to meet its duties and that its breach would cause Plaintiffs and members of the Class to suffer the foreseeable harms associated with the exposure of their PII.

275. Defendant's various violations and its failure to comply with applicable laws and regulations constitute negligence *per se*.

276. As a direct and proximate result of Defendant's negligence *per se*, Plaintiffs and Class Members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

**THIRD CAUSE OF ACTION**
**Breach of Implied Contract**
**(On Behalf of Plaintiffs and the Class)**

277. Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

278. Plaintiffs and Class Members were required to provide their PII to Defendant as a condition of receiving employment provided by Defendant. Plaintiffs and Class Members provided their PII to Defendant or its third-party agents in exchange for Defendant's employment.

279. Plaintiffs and Class Members reasonably understood that a portion of the funds they derived from their labor would be used to pay for adequate cybersecurity measures.

280. Plaintiffs and Class Members reasonably understood that Defendant would use adequate cybersecurity measures to protect the PII that they were required to provide based on Defendant's duties under state and federal law and its internal policies.

281. Plaintiffs and the Class Members accepted Defendant's offers by disclosing their PII to Defendant or its third-party agents in exchange for employment.

282. In turn, and through internal policies, Defendant agreed to protect and not disclose the PII to unauthorized persons.

283. In its Privacy Policy, Defendant represented that it had a legal duty to protect Plaintiffs' and Class Members' PII.

284. Implicit in the parties' agreement was that Defendant would provide Plaintiffs and Class Members with prompt and adequate notice of all unauthorized access and/or theft of their PII.

285.    After all, Plaintiffs and Class Members would not have entrusted their PII to Defendant in the absence of such an agreement with Defendant.

286.    Plaintiffs and the Class fully performed their obligations under the implied contracts with Defendant.

287.    The covenant of good faith and fair dealing is an element of every contract. Thus, parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—and not merely the letter—of the bargain. In short, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

288.    Subterfuge and evasion violate the duty of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or consist of inaction. And fair dealing may require more than honesty.

289.    Defendant materially breached the contracts it entered into with Plaintiffs and Class Members by:

    a.    failing to safeguard their information;

    b.    failing to notify them promptly of the intrusion into its computer systems that compromised such information.

    c.    failing to comply with industry standards;

    d.    failing to comply with the legal obligations necessarily incorporated into the agreements; and

    e.    failing to ensure the confidentiality and integrity of the electronic PII that Defendant created, received, maintained, and transmitted.

48

290.    In these and other ways, Defendant violated its duty of good faith and fair dealing.

291.    Defendant's material breaches were the direct and proximate cause of Plaintiffs' and Class Members' injuries (as detailed *supra*).

292.    And, on information and belief, Plaintiffs' PII has already been published—or will be published imminently—by cybercriminals on the dark web.

293.    Plaintiffs and Class Members performed as required under the relevant agreements, or such performance was waived by Defendant's conduct.

**FOURTH CAUSE OF ACTION**
**Invasion of Privacy**
**(On Behalf of Plaintiffs and the Class)**

294.    Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

295.    Plaintiffs and the Class had a legitimate expectation of privacy regarding their highly sensitive and confidential PII and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

296.    Defendant owed a duty to its current and former employees, including Plaintiffs and the Class, to keep this information confidential.

297.    The unauthorized acquisition (i.e., theft) by a third party of Plaintiffs' and Class Members' PII is highly offensive to a reasonable person.

298.    The intrusion was into a place or thing that was private and entitled to be private. Plaintiffs and the Class disclosed their sensitive and confidential information to Defendant, but did so privately, with the intention that their information would be kept confidential and protected from unauthorized disclosure. Plaintiffs and the Class were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

49

299.    The Data Breach constitutes an intentional interference with Plaintiffs' and the Class's interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

300.    As the Restatement explains, as used throughout the Restatement of Torts, intent "has reference to the consequences of an act rather than the act itself." Restatement (Second) of Torts § 8A, cmt. A (1964). "Intent is not, however, limited to consequences which are desired. If the actor knows that the consequences are certain, or substantially certain, to result from her act, and still goes ahead, she is treated by the law as if she had in fact desired to produce the result." *Id.* cmt. B.

301.    Indeed, given the foreseeability of the harms inherent in data breaches and the ubiquitous nature of data breaches, Defendant was substantially certain that its failure to implement reasonable cybersecurity standards would lead to an invasion of Plaintiff's privacy.

302.    Defendant acted with a knowing state of mind when it permitted the Data Breach because it knew its information security practices were inadequate.

303.    Defendant acted with a knowing state of mind when it failed to notify Plaintiffs and the Class in a timely fashion about the Data Breach, thereby materially impairing their mitigation efforts.

304.    Acting with knowledge, Defendant had notice and knew that its inadequate cybersecurity practices would cause injury to Plaintiffs and the Class.

305.    As a proximate result of Defendant's acts and omissions, the private and sensitive PII of Plaintiffs and the Class was stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiffs and the Class to suffer damages (as detailed *supra*).

306.    And, on information and belief, Plaintiffs' PII has already been published—or will be published imminently—by cybercriminals on the dark web.

307.    Unless and until enjoined and restrained by order of this Court, Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and the Class since their PII is still maintained by Defendant with their inadequate cybersecurity system and policies.

308.    Plaintiffs and the Class have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Defendant's inability to safeguard the PII of Plaintiffs and the Class.

309.    In addition to injunctive relief, Plaintiffs, on behalf of themselves and the other Class Members, also seek compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest and costs.

## FIFTH CAUSE OF ACTION
### Unjust Enrichment
### (On Behalf of Plaintiffs and the Class)

310.    Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

311.    This claim is pleaded in the alternative to the breach of implied contract claim.

312.    Plaintiffs and Class Members conferred a benefit upon Defendant. After all, Defendant benefitted from (1) using their PII to facilitate employment, and (2) using their labor to derive profit.

313.    Defendant appreciated or had knowledge of the benefits it received from Plaintiffs and Class Members.

51

314.    Plaintiffs and Class Members reasonably understood that Defendant would use adequate cybersecurity measures to protect the PII that they were required to provide based on Defendant's duties under state and federal law and its internal policies.

315.    Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' PII.

316.    Instead of providing a reasonable level of security or retention policies that would have prevented the Data Breach, Defendant instead calculated to avoid its data security obligations at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

317.    Under principles of equity and good conscience, Defendant should not be permitted to retain the full value of Plaintiffs' and Class Members' (1) PII and (2) employment because Defendant failed to adequately protect their PII.

318.    Plaintiffs and Class Members have no adequate remedy at law.

319.    Defendant should be compelled to disgorge into a common fund—for the benefit of Plaintiffs and Class Members—all unlawful or inequitable proceeds that it received because of its misconduct.

### SIXTH CAUSE OF ACTION
**Breach of Confidence**
**(On Behalf of Plaintiffs and the Class)**

320.    Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

321.    Plaintiffs and Class Members disclosed their highly sensitive PII to Defendant in confidence—with the implicit and explicit understanding that Defendant would collect, store, and protect their PII (and *not* allow the disclosure of their PII to unauthorized third parties).

322. As such, by obtaining (and continuing to maintain) Plaintiffs' and Class Members' PII, Defendant assumed an obligation to maintain the confidentiality of that PII.

323. At all times during the relationship between Defendant and Plaintiffs and Class Members, Defendant was/were fully aware of the highly confidential nature of Plaintiffs' and Class Members' PII.

324. Thus, Defendant intentionally, knowingly, and/or negligently committed the tort of breach of confidence by, *inter alia*:

    a.    failing to sufficiently encrypt or otherwise protect Plaintiffs' and Class Members' PII;

    b.    failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period;

    c.    and via the numerous instances of misconduct detailed *supra*.

325. As a direct and proximate result of Defendant's breach of confidence, Plaintiffs and Class Members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

**<u>SEVENTH CAUSE OF ACTION</u>**
**Declaratory Judgment**
**(On Behalf of Plaintiffs and the Class)**

326. Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

327. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. The Court has broad authority to restrain acts, such as those alleged herein, which are tortious and unlawful.

328. In the fallout of the Data Breach, an actual controversy has arisen about Defendant's various duties to use reasonable data security. On information and belief, Plaintiffs

allege that Defendant's actions were—and *still* are—inadequate and unreasonable. And Plaintiffs and Class Members continue to suffer injury from the ongoing threat of fraud and identity theft.

329.    Given its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

      a.    Defendant owed—and continues to owe—a legal duty to use reasonable data security to secure the data entrusted to it;

      b.    Defendant has a duty to notify impacted individuals of the Data Breach under the common law and Section 5 of the FTC Act;

      c.    Defendant breached, and continues to breach, its duties by failing to use reasonable measures to the data entrusted to it; and

      d.    Defendant breaches of its duties caused—and continues to cause—injuries to Plaintiffs and Class Members.

330.    The Court should also issue corresponding injunctive relief requiring Defendant to use adequate security consistent with industry standards to protect the data entrusted to it.

331.    If an injunction is not issued, Plaintiffs and the Class will suffer irreparable injury and lack an adequate legal remedy if Defendant experiences a second data breach.

332.    And if a second breach occurs, Plaintiffs and the Class will lack an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages—while warranted for out-of-pocket damages and other legally quantifiable and provable damages—cannot cover the full extent of Plaintiffs' and Class Members' injuries.

333.    If an injunction is not issued, the resulting hardship to Plaintiffs and Class Members far exceeds the minimal hardship that Defendant could experience if an injunction is issued.

334.    An injunction would benefit the public by preventing another data breach—thus preventing further injuries to Plaintiffs, Class Members, and the public at large.

**PRAYER FOR RELIEF**

Plaintiffs and Class Members respectfully request judgment against Defendant and that the Court enter an order:

A.    Certifying this case as a class action on behalf of Plaintiffs and the proposed Class, appointing Plaintiffs as class representative, and appointing his counsel to represent the Class;

B.    Awarding declaratory and other equitable relief as necessary to protect the interests of Plaintiffs and the Class;

C.    Awarding injunctive relief as necessary to protect the interests of Plaintiffs and the Class;

D.    Awarding Plaintiffs and the Class damages, including applicable compensatory, exemplary, punitive damages, and statutory damages, as allowed by law;

E.    Awarding restitution and damages to Plaintiffs and the Class in an amount to be determined at trial;

F.    Awarding attorneys' fees and costs, as allowed by law;

G.    Awarding prejudgment and post-judgment interest, as provided by law;

H.    Granting Plaintiffs and the Class leave to amend this complaint to conform to the evidence produced at trial; and

I.    Granting other relief that this Court finds appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial for all claims so triable.


Date: May 8, 2026

Respectfully submitted,

By: */s/ Raina C. Borrelli*
    Raina C. Borrelli
    **STRAUSS BORRELLI PLLC**
    One Magnificent Mile
    980 N. Michigan Ave., Suite 1610
    Chicago, IL 60611
    Telephone: (872) 263-1100
    Facsimile: (872) 263-1109
    raina@straussborrelli.com

    Mark A. Cianci
    **ISRAEL DAVID LLC**
    399 Boylston Street, Floor 6, Suite 23
    Boston, Massachusetts 02116
    Telephone: (617) 295-7771
    mark.cianci@davidllc.com

    Leanna A. Loginov (full admission pending)
    **SHAMIS & GENTILE, P.A.**
    14 NE 1st Ave, Suite 705
    Miami, Florida 33132
    T: (305) 479-2299
    lloginov@shamisgentile.com

    J. Gerard Stranch, IV
    Grayson Wells
    Samuel Douthit
    **STRANCH, JENNINGS & GARVEY, PLLC**
    223 Rosa L. Parks Ave., Ste. 200
    Nashville, TN 37203
    (615) 254-8801
    (615) 255-5419
    gstranch@stranchlaw.com
    gwells@stranchlaw.com
    sdouthit@stranchlaw.com

    *Interim Class Counsel*

56

Melissa G. Meyer
**LEVI & KORSINSKY, LLP**
33 Whitehall St., 27th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: mmeyer@zlk.com

*Additional Plaintiffs' Counsel*

## CERTIFICATE OF SERVICE

I, Raina C. Borrelli, hereby certify that on May 8, 2026, I electronically filed the

foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of

such filing to counsel of record, via the ECF system.

DATED this 8th day of May, 2026.

STRAUSS BORRELLI PLLC

By: */s/ Raina C. Borrelli*
  Raina C. Borrelli
  STRAUSS BORRELLI PLLC
  One Magnificent Mile
  980 N. Michigan Ave., Suite 1610
  Chicago, IL 60611
  Telephone: (872) 263-1100
  Facsimile: (872) 263-1109
  raina@straussborrelli.com